**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| STEPHEN G. CONKLIN, | : | |
| | : | **Civil Action No. 1:05-CV-1726** |
| **Plaintiff** | : | |
| | : | **(Chief Judge Kane)** |
| v. | : | |
| | : | |
| PURCELL, KRUG & HALLER, <u>et al.</u>, | : | |
| | : | |
| **Defendants** | : | |

**<u>MEMORANDUM</u>**

Pending before the Court are motions to dismiss filed by each of the named Defendants in

this action.  The motions have been briefed, or the period for briefing has otherwise expired, and

the motions are ripe for disposition.  For the reasons that follow, the motions will be granted.

**I.      Background**

Plaintiff, acting <u>pro se</u>, commenced this action by filing a complaint on August 23, 2005.

(Doc. No. 1.)  Plaintiff amended the complaint on October 12, 2005.  (Doc. No. 3.)  On

November 17, 2005, Plaintiff's counsel entered an appearance in this action.  (Doc. No. 8.)

Nearly a month later, counsel sought an extension to file a second amended complaint in order

"to properly frame the appropriate legal issues and causes of action and to correct and cure legal

and factual deficiencies set forth in the First Amended Complaint, as filed by Mr. Conklin, pro

se."  (Doc. No. 10 ¶ 6.)  On February 3, 2006, Plaintiff submitted his second amended complaint.

(Doc. No. 27.)

Plaintiff alleges that a number of financial institutions and individuals violated federal

and state laws regulating debt collection and foreclosure proceedings.  Additionally, Plaintiff

appears to allege that certain of the Defendants violated the Racketeer Influenced and Corrupt

Organization Act ("RICO") and other federal laws regulating use of the mail.  All Defendants have moved to dismiss the second amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim.  Additionally, in the various reply briefs, several Defendants have noted that Plaintiff has either failed to submit a brief in opposition, or has failed to respond to certain legal arguments offered in support of the motions.

## II.      Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the allegations made in a complaint.  Ditri v. Coldwell Banker Residential Affiliates, Inc., 954 F.2d 869, 871 (3d Cir. 1992).  Although the Court must view the complaint in the light most favorable to the plaintiff, the court need not credit a complaint's bald assertions or legal conclusions.  Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).  The Court must determine whether "the facts alleged in the complaint, even if true, fail to support the . . . claim."  Ranson v. Marrazzo, 848 F.2d 398, 401 (3d Cir. 1988).  If the Court determines that no set of facts could be proven that would establish a right to relief, the case must be dismissed. Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1391 (3d Cir. 1994).

## III.     Factual Background

The following facts, which are accepted as true for purposes of this decision, are taken from the Second Amended Complaint.[1]  Plaintiff and his former wife purchased certain real

---

[1]  The Court notes that the Second Amended Complaint, which differs in almost no material respect from the initial Amended Complaint, contains a multitude of legal conclusions together with limited allegations of fact.  Although the Court accepts as true all well-pleaded factual allegations for purposes of evaluating the pending motions to dismiss, the Court is not required to accept Plaintiff's bald allegations or legal conclusions.  Accordingly, while the Court will accept as true Plaintiff's factual allegations, Plaintiff's legal conclusions will be neither accepted nor included in this discussion of the relevant factual background.  Additionally,

property located at 100 Spangler Road, Lewisberry, Pennsylvania ("Property"), using funds

borrowed from Saxon Mortgage Services, Inc. ("Saxon").  The loan was secured by a mortgage

on the Property.  (Second Am. Compl. ¶¶ 24-25.)  On or about May 15, 1997, Saxon assigned the

loan to Defendant Chase Bank of Texas ("Chase") and assigned the servicing rights to the loan to

Meritech Mortgage Services, Inc.  (Id. ¶ 26.)

      In July 1998, Plaintiff alleges that "erroneous entries were detected . . . affecting Plaintiff

Conklin's account and/or balance."  (Id. ¶ 29.)  Plaintiff alleges that he endeavored to have his

former counsel "address these and other significant discrepancies during bankruptcy, which to

date, after seven years, remains in scope & in depth, un-accounted for."[2]  (Id.)  On August 6,

1998, Plaintiff filed a petition pursuant to Chapter 13 of the United States Bankruptcy Code with

the United States Bankruptcy Court for the Middle District of Pennsylvania.

      Plaintiff alleges that Chase, as assignee of Saxon, working with "no less than five

different law firms as debt collectors, and two law firms and/or overseers," caused Plaintiff's

property "to be illegally and maliciously foreclosed upon" between 1998 and 2005.  (Id. ¶ 32.)

The Second Amended Complaint provides little or no detail regarding these alleged foreclosures,

although in the course of describing Defendants' various activities associated with foreclosure,

Plaintiff concedes that he was in default of his loan obligations.  (Id. ¶ 40.)

_____

Plaintiff's rather prolix Second Amended Complaint is in many instances extremely difficult to
decipher, and occasionally resorts to parenthetical questions and other rhetorical devices that
cannot be construed as allegations of fact.  Where a statement or allegation contained in the
Second Amended Complaint cannot be construed as an allegation of fact, the assertion has not
been accepted as true.

      [2] Plaintiff does not specifically allege what party is responsible for such "erroneous
entries" and "other significant discrepancies" to his loan account, nor is it clear that Plaintiff is
asserting a claim predicated on such allegations.

In May 2002, in connection with Plaintiff's bankruptcy proceedings, the Bankruptcy Court entered a scheduling order for a trial "regarding the long standing and unresolved disputes between Plaintiff and Defendant CHASE and its representatives." (Id. ¶ 43.)  In June 2002, Saxon allegedly re-obtained the mortgage servicing rights from Meritech, although Saxon failed to notify Plaintiff of this transfer.

In November 2002, Plaintiff learned that Chase was "finally willing to allow Plaintiff to sub-divide property and further allow Plaintiff to reinstate payments" and that the trial scheduled in connection with the bankruptcy proceedings would be set aside indefinitely. (Id. ¶ 47.) Plaintiff claims that all of the named Defendants "whether in whole or in part, as each respective party may be deemed otherwise complicit thereto, knew for whatever reason(s), that Plaintiff was pre-disposed [sic] to fail in securing a sub-division, despite the fact that Plaintiff was years earlier, conditionally approved." (Id. ¶ 48.)

During 2003, Plaintiff began making mortgage payments, as instructed by Chase's counsel. (Id. ¶ 49.)  Plaintiff thereafter learned that a significant portion of the payments was unaccounted for. (Id.)  Plaintiff claims this is the third time that such payments were not being fully and properly accounted for, with the previous occurrences happening in 1998 and 1999. (Id.)

In April 2004, the law firm of Purcell, Krug, & Haller ("PKH"), counsel for Chase, filed a Praecipe to Reissue Writ of Execution-Mortgage Foreclosure. (Id. ¶ 51.)  Plaintiff avers that Defendant PKH and its attorneys failed to include a valid complaint to foreclose upon the Property. (Id.)  Plaintiff raised this issue with Defendant PKH, but the law firm ignored the defects associated with the planned sale. (Id. ¶ 52.)  Plaintiff also alleges that his former counsel

4

"surreptitiously lifted the temporary restraining order" that was in place in order to stay the foreclosure.  (Id. ¶ 53.)  At around the same time, Plaintiff's former counsel withdrew from representation without notifying Plaintiff.  (Id.)

PKH scheduled a sheriff's sale for August 23, 2004, even though the law firm knew Plaintiff was unrepresented and was "the least sophisticated consumer" and therefore "was an easy target."  (Id. ¶ 56.)  The PKH Defendants failed to notify Plaintiff's former wife regarding the planned sale of the Property.  (Id. ¶ 57.)  Thereafter, Plaintiff engaged in a series of attempts to suspend the planned sale.  (Id. ¶¶ 58-61.)  Plaintiff subsequently was notified that the foreclosure sale was rescheduled from August 23, 2004, until October 18, 2004.  (Id. ¶ 63.)

On or about October 5, 2004, an unidentified representative of Defendant Saxon came onto the Property without Plaintiff's permission and conducted a mortgage inspection.  (Id. ¶ 68.)  On October 7, 2004, an employee of nonparty ReMax Realty came onto the Property attempting to take pictures, but was rebuffed by Plaintiff.  (Id. ¶ 69.)  On October 15, 2004, a representative of Defendant Saxon contacted Plaintiff's father, although the Second Amended Complaint contains no further allegations regarding the nature of the contact.  (Id. ¶ 71.)

On October 18, 2004, Plaintiff filed legal papers seeking a temporary restraining order to halt the sale of the Property.  (Id. ¶ 72.)  Defendant PKH ignored Plaintiff's protests and proceeded with the scheduled foreclosure.  (Id. ¶¶ 72-76.)  In the course thereof, Defendant PKH ignored a lis pendens that Plaintiff's counsel had placed on the Property's records, further ignored Plaintiff's counsel's assertions regarding flaws in the foreclosure process, and "strongly recommended" that the York County Sheriff proceed with the sale of the Property as scheduled. (Id.)  Plaintiff avers that Defendant Leon Haller of PKH ignored his "fiduciary" duty to Plaintiff

in pushing forward with the foreclosure despite various flaws, causing Plaintiff and his entire household to incur emotional pain and suffering.  (Id. ¶ 79.)

In connection with the foreclosure process, the Property was sold to Harry Ramage, d/b/a Aldardan, Inc.  (Id. ¶ 83.)  On October 19, 2004, Mr. Ramage came to the Property to advise Plaintiff that he and his family had 30 days to vacate the farm.  (Id.)  Plaintiff informed Mr. Ramage about certain deficiencies and flaws associated with the sale of the Property and that Plaintiff was working to have the sale set aside.  (Id.)  In response, Mr. Ramage "reassessed his prior urgency to eject said Plaintiff."  (Id.)

In late October 2004, representatives from Saxon contacted Plaintiff's father and were belligerent and offensive.  (Id. ¶ 88.)  Shortly thereafter, a representative from Saxon contacted Plaintiff "and [left] a nasty message."  (Id. ¶ 89.)

On October 28, 2004, Plaintiff, through his former counsel, filed with an unspecified court a motion to set aside the sheriff's sale.  (Id. ¶ 90.)  At around the same time, an attorney representing Mr. Ramage wrote to Defendant PKH detailing the defects associated with the sale of the Property, and demanded the return of Mr. Ramage's $35,000 deposit.  (Id. ¶ 91.)  Through the efforts of Mr. Ramage and his counsel, the sheriff's sale was set aside.  (Id. ¶¶ 95, 103.)

Defendant EMC Mortgage Corporation ("EMC") sent Plaintiff a letter dated December 13, 2004, containing a notice of transfer of the mortgage-servicing rights from Defendant Saxon, effective November 30, 2004.  (Id. ¶ 107.)  This correspondence did not include a "Notice of Debt Validation."  (Id.)  Plaintiff did not receive the debt-validation notice until December 24, 2004.  (Id. ¶ 108.)  In a letter dated December 27, 2004, Plaintiff responded to EMC to dispute the debt-validation notice.  (Id. ¶ 109.)  Subsequently, in a letter dated December 29, 2004,

Defendant EMC notified Plaintiff that he was carrying inadequate fire insurance on the Property and that the letter was an attempt to collect a debt.  (Id. ¶ 110.)

Plaintiff alleges receiving other correspondence regarding the loan in the following months from various entities, none of which were identified as representatives or agents of any of the named Defendants.  (Id. ¶¶ 112-15.)

In January 2005, a representative of EMC called Plaintiff to determine his "intentions" with respect to the loan, but Plaintiff would not discuss the loan, insisting that all communication must be in writing and "certified."  (Id. ¶¶ 118-19.)   Thereafter, in July 2005, EMC sent Plaintiff an Act 91 Notice, advising him of his rights, notifying him that the loan was in default, and advising him that EMC intended to foreclose on the Property.  (Id. ¶¶ 122-25.)

Subsequently, Plaintiff set about to "clarify and/or classify all parties in question" having business with the loan.  (Id. ¶ 125.)  In connection with this process, Plaintiff first became aware that Defendant Fidelity National Foreclosure Solutions ("Fidelity") was acting as a servicer of Plaintiff's loan account and was responsible for preparing documents associated with the foreclosure.  (Id. ¶¶ 126-27.)  Upon contacting Defendant Fidelity on multiple occasions, Plaintiff was requested to refer his requests to Attorney Leon Haller of Defendant PKH.  (Id. ¶¶ 129-30.)

In late July 2005, Plaintiff responded to EMC's Act 91 letter to dispute the debt validation and other issues relating to the loan.  Thereafter, on or about August 19, 2005, Plaintiff learned that Defendant PKH was no longer involved as counsel in the planned foreclosure of the Property.  (Id. ¶ 142.)  On August 23, 2005, "cognizant of the 'one year statute of limitations,'"

Plaintiff "hastily file[d] . . . suit" against the named Defendants.[3]

**IV.      Discussion**

Plaintiff asserts claims under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et

seq. ("FDCPA"), and derivative claims under the Pennsylvania Fair Credit Extension Uniformity

Act, 73 P.S. § 2270.1 et seq. ("FCEUA"), and the Pennsylvania Unfair Trade Practices and

Consumer Protection Law, 73 P.S. § 201-1 ("UTPCPL").  Additionally, Plaintiff appears to be

alleging claims under Federal RICO laws and other federal laws regulating use of the mail.  As

discussed below, the central thrust of this action is Plaintiff's allegation that all of the Defendants

individually and collectively, and under a respondeat superior theory of liability, violated state

and federal law in connection with the foreclosure of a home Plaintiff purchased in 1997 with the

aid of a loan in which he was admittedly in default.

Defendants have each moved to dismiss the Second Amended Complaint and support

their motions with a number of legal arguments, which will be addressed in turn.

**A.      Claims Under the FDCPA, FCEUA, and UTPCPL**

Plaintiff's first three counts of the Second Amended Complaint are predicated on alleged

violations of the FDCPA.  Additionally, Plaintiff has attempted to assert claims against some or

all of the Defendants under the FCEUA and UTPCPL, and Plaintiff has predicated these claims

upon his FDCPA claims.  Although the legal claims are extremely difficult to decipher, it appears

that Plaintiff is alleging that each of the named Defendants are liable under the FDCPA for a

multitude of statutory violations, committed individually, and also pursuant to a theory that all of

---

[3]  This represents the last factual allegation of the Second Amended Complaint.  The remaining 151 paragraphs of the complaint set forth Plaintiff's legal theories and conclusions in four separate counts.

the Defendants are responsible for the actions of PKH through respondeat superior.  Each of the

Defendants has offered numerous and varied legal arguments in support of their motions to

dismiss these claims, and they will be addressed seriatim.

     **1.**    **Chase Bank**

     Chase contends that is not liable under the FDCPA because it is not a "debt collector" as

that term is defined under the statute.  Under the FDCPA, a "debt collector" is "any person who

uses any instrumentality of interstate commerce or the mails in any business the principal

purpose of which is the collection of any debt, or who regularly collects or attempts to collect,

directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C. §

1692a.  Consistent with the foregoing definition, the FDCPA is not applicable to a creditor

seeking to recover a debt owed to it.  See Pollice v. Nat'l Tax Funding, L.P., 225 F.3d 379, 403

(3d Cir. 2000) ("Creditors – as opposed to 'debt collectors' – generally are not subject to the

FDCPA."); Gary v. Goldman & Co., 180 F. Supp. 2d 668, 672 (E.D. Pa. 2002) ("Creditors

themselves are thus generally not subject to the FDCPA."); see also Aubert v. American Gen.

Fin., Inc.,137 F.3d 976, 978 (7th Cir. 1998) ("Creditors who collect in their own name and whose

principal business is not debt collection . . . are not subject to the Act.").

     The Second Amended Complaint alleges that Chase, as assignee of Saxon, was the

creditor for the mortgage debt at issue.  Accordingly, the Court finds that Plaintiff has failed to

state a claim under the FDCPA, as Chase is not considered a "debt collector" within the meaning

of the statute.

     In addition, Plaintiff has predicated his claims brought under the FCEUA and the

UTPCPL upon his FDCPA claims.  It is not clear that Plaintiff is alleging a claim against Chase

9

under the FCEUA or the UTPCPL.  However, in the event Plaintiff is attempting to assert a

claim against Chase under these statutes, the Court finds that Plaintiff's claims must also be

dismissed for failure to state a claim.

      **2.**     **Saxon**

Saxon similarly moves to dismiss Plaintiff's claims brought under the FDCPA, the

FCEUA, and the UTPCPL on the grounds that, inter alia, Saxon is not a debt collector and is

therefore exempt from the FDCPA.  Saxon notes that nowhere in the Second Amended

Complaint does Plaintiff allege that Saxon's principal business is as a debt collector.  Instead, the

limited factual allegations against Saxon make clear that Saxon is a mortgage-servicing company

that, for a period of time, had the servicing rights to Plaintiff's mortgage.  When a company is

servicing a current payment plan or forbearance agreement rather than demanding payment on a

defaulted loan, that company is not subject to the FDCPA.  Bailey v. Sec. Nat'l Servicing Corp.,

154 F.3d 384, 385-86 (7th Cir. 1998); see also Zlupko v. Washington Mutual Bank, 2004 U.S.

Dist. LEXIS 20721, at *6 n.2 (E.D. Pa. Oct. 13, 2004) ("Mortgage lenders and servicers . . . are

generally exempt from the FDCPA."); Sponaugle v. First Union Mortgage Corp., 40 Fed. Appx.

715, 717 n.2 (3d Cir. 2002) (questioning the possibility that a mortgage-servicing company could

be considered a "debt collector" for a debt not in default at the time it was obtained).  As another

district court has noted, "the law is well-settled . . . that creditors, mortgagors, and mortgage

servicing companies are not debt collectors and are statutorily exempt from liability under the

FDCPA."  Scott v. Wells Fargo Home Mortgage, Inc., 326 F. Supp. 2d 709, 718 (E.D. Va. 2003)

(emphasis added).  It is true, however, that if the mortgage at issue was already in default at the

time that the mortgage servicing company began servicing the loan, then the statute will be found

applicable to a loan servicer as a "debt collector." Dawson v. Dovenmuehle Mortgage, Inc.,
2002 U.S. Dist. LEXIS 5688, at *14-15 (E.D. Pa. April 3, 2002) (citing Perry v. Stewart Title
Co., 756 F.2d 1197, 1208 (5th Cir. 1985)).

Plaintiff alleges that Saxon re-obtained servicing rights to the mortgage on June 1, 2002,
after Plaintiff was allegedly in default.  (Second Am. Compl. ¶¶ 43-44.)  Most of the actions
allegedly taken by Saxon following their firm's assumption of the servicing rights would have
been time-barred as of August 23, 2004.  Review of the Second Amended Complaint reveals an
allegation that some unnamed representatives of Saxon left Plaintiff "nasty" telephone messages
within the two-year statutory time period.  This allegation is both conclusory and vague, and it
nowhere alleges that the messages were related to collection of a debt, nor how the messages are
claimed to have violated the FDCPA.  Similarly, Plaintiff alleges that a Saxon employee was
trespassing on his property, but does not specifically allege that this act was related to debt
collection, nor how this alleged trespass violated the FDCPA.  Plaintiff has not responded
substantively to Saxon's arguments in favor of dismissal, instead merely reiterating the
allegations in the Second Amended Complaint.  Plaintiff's response in this regard is inadequate,
and the Court finds Plaintiff has failed to state a claim against Saxon upon which relief can be
granted.

### 3.    Fidelity

Fidelity moves to dismiss Plaintiff's claims brought under the FDCPA, the FCEUA, and
the UTPCPL on the grounds that, inter alia, Fidelity is not a debt collector but rather a "liason
[sic] between the mortgage lender and local legal counsel" who took no part in the actual debt
collection and is therefore exempt from the FDCPA.  (Doc. No. 29, at 4.)  Plaintiff's Second

Amended Complaint fails to allege that Fidelity's principal business is as a debt collector. Rather, Plaintiff acknowledges Fidelity's role as a mortgage-servicing company. (Second Am. Compl. ¶ 127.)  Plaintiff acknowledges that Fidelity had begun servicing the mortgage "as of an unspecified date in 2001," which is before the complaint appears to allege that Plaintiff defaulted on his obligations under the mortgage.  As discussed <u>supra</u>, when the mortgage at issue is not already in default, "mortgage servicing companies are not debt collectors and are statutorily exempt from liability under the FDCPA."  <u>Scott</u>, 326 F. Supp. 2d at 718.  Even if Fidelity had begun servicing the mortgage after it was in default, Plaintiff does not allege that Fidelity took any steps to enforce payment of Plaintiff's debt.  The only contact between Plaintiff and Fidelity occurred when Plaintiff telephoned Fidelity himself, only to be redirected to PKH for information.  Accordingly, the Court finds that Plaintiff's FDCPA and accompanying FCEUA and UTPCPL claims against Fidelity must be dismissed for failure to state a claim upon which relief can be granted.

### 4.    EMC

EMC and its president, Raylene Ruyle (collectively, "EMC"), also move to dismiss Plaintiff's claims on the grounds that EMC is not a debt collector and is therefore exempt from the FDCPA, and because there is no basis for imposing respondeat superior liability on either defendant.  Plaintiff's Second Amended Complaint indicates that EMC assumed Saxon's servicing rights to the mortgage on November 30, 2004, and although it is exceptionally difficult to understand the multitude of allegations – both factual and legal – that Plaintiff makes against EMC, the Court interprets the second amended complaint to allege that EMC was, in fact,

operating as a creditor seeking to collect a debt owed by Plaintiff that EMC had obtained.[4]  To

the extent EMC was acting as a creditor, the Court does not find that Plaintiff has sufficiently

pleaded facts that would cause EMC to be potentially liable under the FDCPA, the FCEUA, or

the UTPCPL.  (See Part IV.A.1, supra.)  Moreover, even reading the allegations in the second

amended complaint liberally, the Court cannot find that Plaintiff has sufficiently averred facts

that would cause EMC to be liable under FDCPA, the FCEUA, or the UTPCPL, and the Court

finds that Plaintiff has insufficiently pleaded how EMC has violated these statutes.  Accordingly,

Plaintiff's claims brought under the FDCPA, the FCEUA, and the UTPCPL will be dismissed

against EMC.

### 5.      PKH

Plaintiff claims that Defendant PKH, along with the individual attorneys or employees

that comprise the law firm, acted in violation of the FDCPA and, derivatively, the FCEUA and

UTPCPL.  PKH's Motion to Dismiss argues that the Second Amended Complaint does not

implicate PKH in any matter other than judicial proceedings, and that the FDCPA does not

provide a remedy for the complained-of actions taken in the course of judicial proceedings.

(Doc. No. 31, at 8.)  Additionally, the PKH Defendants argue that Plaintiff does not plead a

violation of the debt-collection statutes with respect to the firm or its attorneys.

PKH's assertion that they are insulated by virtue of acting through judicial proceedings is

legally incorrect.  In 1995 the United States Supreme Court unanimously ruled that an attorney

---

[4]  At various places in the second amended complaint, Plaintiff argues or concludes that
EMC should not be considered a creditor, but the Court does not credit these bald allegations or
legal conclusions, nor is the Court required to do so in reviewing a motion to dismiss.  See Morse
v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).

who engages in litigation to collect consumer debts is not shielded from FDCPA coverage.

Heintz v. Jenkins, 514 U.S. 291, 292 (1995); see also Crossley v. Lieberman, 868 F.2d 566, 569

(3d Cir. 1989) (recognizing that in 1986 Congress amended the FDCPA to remove lawyers'

exemption from liability).  However, Heintz does indicate that an attorney-debt-collector may

still notify a debt-owing consumer that it is invoking or intending to invoke a judicial remedy,

even if that consumer has ordered the debt collector to "cease further communication."  Heintz,

514 U.S. at 296 (quoting 15 U.S.C. § 1692c(c)).  Additionally, an attorney-debt-collector is free

to bring a claim against a debtor, and even if the litigating lawyer loses that claim, he will be

protected from the FDCPA "if he 'shows by a preponderance of evidence that the violation was

not intentional and resulted from a bona fide error notwithstanding the maintenance of

procedures reasonably adapted to avoid any such error.'"  Id. at 295 (quoting 15 U.S.C.

§ 1692k(c)).

       Nevertheless, the Court concludes that Plaintiff has failed to sufficiently allege facts that

would cause PKH to be liable under the FDCPA, FCEUA, or UTPCPL.  From August 23, 2003,

until the filing of Plaintiff's original complaint, Plaintiff has only alleged contact by PKH

through the notice of the August 23, 2003, sheriff's sale and the rescheduling of that sale for

October 18, 2004.  Plaintiff's allegations that PKH notified him of these attempted judicial

remedies, regardless of Plaintiff's wishes not to receive communications from debt collectors,

does not constitute a violation of the statutes Plaintiff has invoked.  It is true that Plaintiff has

alleged that the August 23, 2003, attempted sheriff's sale was riddled with errors, specifically in

that the documents associated with the foreclosure sale listed the wrong property to be sold, and

that certain legal documents that were prepared contained deficiencies that PKH concealed.

Nevertheless, despite these factual averments and extensive legal conclusions that make up the second amended complaint, and notwithstanding the liberal pleadings rules authorized by Rule 8 of the Federal Rules of Civil Procedure, the Court does not find that Plaintiff has sufficiently averred how PKH or Attorney Haller could be found to have violated the federal and state debt-collection statutes at issue.  Plaintiff has amended his complaint on two separate occasions, ostensibly in an effort to clarify his claims, and has simply failed to plead sufficiently violations of the FDCPA, FCEUA, and UTPCPL.  Accordingly, Plaintiff's claims against PKH and its attorneys brought under these statutes will be dismissed.[5]

### B.    Claims Under RICO and Use of the Mail

Plaintiff's second amended complaint appears to allege generally violations of Federal law prohibiting racketeering and mail fraud.  Defendants have moved to dismiss these claims,

---

[5]  Although the Court has concluded that Plaintiff failed to plead sufficiently claims under the FDCPA, the FCEUA, and UTPCPL and has concluded that these claims must be dismissed, the Court finds it relevant to comment briefly upon an argument advanced by Saxon to which Plaintiff never responded and which the Court did not need to reach before concluding that Plaintiff's claims against Saxon must be dismissed.  Saxon argued that Plaintiff did not allege the existence of a "debt" as that term is defined by the FDCPA.  (Doc. No. 33, at 4.)  Under the FDCPA, a "debt" is defined as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes."  15 U.S.C. § 1692a(5).  The FDCPA is not applicable to debts incurred for business purposes.  Ranck v. Fulton Bank, 1994 U.S. Dist. LEXIS 1402, at *11 (E.D. Pa. Feb. 4, 1994).  An agricultural loan transaction is not considered to be "incurred for 'personal family, or household purposes.'"  Munk v. Federal Land Bank of Wichita, 791 F.2d 130, 132 (10th Cir. 1986) (quoting 15 U.S.C. § 1692a(5)).  At various places in the Second Amended Complaint, Plaintiff refers to the Property as a "farm."  (Second Am. Compl. ¶¶ 65, 72, 74-75.)  Plaintiff also indicates that he planned to subdivide the Property, and that he had taken steps toward this goal.  (Id. ¶¶ 42, 47-48.)  At other points in the Second Amended Complaint, Plaintiff appears to describe the Property as a private residence.  (Id. ¶ 132.)  To the extent the Property was being utilized for business or commercial purposes, and to the extent the mortgage debt was issued for such purposes, Plaintiff's claims relating to Defendants' debt-collection activities would appear to fall outside the ambit of the FDCPA.

arguing that Plaintiff has failed to allege facts to support them, and that Plaintiff has not adequately pleaded that any Defendants violated RICO or laws regulating the use of the mail. Plaintiff failed to respond to any of the Defendants' motions to dismiss these causes of action.

Saxon argues that mail fraud claims each require first establishing the existence of a conspiracy through factual averments, and Plaintiff has failed to plead such facts.  (Doc. No. 33 at 12.)  See Alfaro v. E.F. Hutton & Co., Inc., 606 F. Supp. 1100, 1117 (E.D. Pa. 1985). Likewise, Saxon contends that Plaintiff's RICO claim fails because Plaintiff has not alleged a pattern of racketeering or an "injury 'in his business or property' caused by the RICO violation." (Id. at 12-13.)  See Zimmerman v. HBO Affiliate Group, 834 F.2d 1163, 1169 (3d Cir. 1987). Plaintiff did not respond to either of these arguments and therefore, in accordance with Local Rule 7.6, they are deemed admitted.[6]  Moreover, the Court finds that Plaintiff has not adequately alleged conspiracy or a pattern of racketeering.  The commonplace commercial practice of buying and selling mortgage-service contracts, without more, does not indicate a conspiracy among the buyers and sellers.  Additionally, Plaintiff's alleged "mental distress" is not a redressable injury under RICO.  Zimmerman, 834 F.2d at 1169.  Accordingly, Defendants' motion to dismiss Plaintiff's claims of mail fraud and RICO violations will be granted.  The Court further finds that because Plaintiff has submitted three complaints in this action, and has additionally elected to ignore Defendants' motions to dismiss these claims, Plaintiff is not

---

[6]  Local Rule 7.6 provides that "[a]ny party opposing any motion shall file an original and two (2) copies of a responsive brief . . . within fifteen (15) days after service of the movant's brief.  Any respondent who fails to comply with this rule shall be deemed not to oppose such motion."  L.R. 7.6.  See Stackhouse v. Mazurkiewicz, 951 F.2d 29, 30 (3d Cir. 1992) (explaining that if a party represented by counsel fails to oppose a motion to dismiss, the motion can be deemed as unopposed and subject to dismissal without a merits analysis).

entitled to further leave to amend the Second Amended Complaint.

**C.      Leave to Amend**

In his briefs opposing Defendants' motions to dismiss, Plaintiff suggests that he should be permitted to amend his complaint for a third time to cure the legal deficiencies that have been identified.  The Court disagrees.  Although Rule 15(a) of the Federal Rules of Civil Procedure provides that "leave [to amend] shall be freely given when justice so requires," Fed. R. Civ. P. 15(a), the Court must also consider the risk of substantial or undue prejudice to Defendants that would follow were Plaintiff permitted yet another amendment.  See USX Corp. v. Barnhart, 395 F.3d 161, 166 (3d Cir. 2004) (citations omitted) (noting that substantial or undue prejudice to the nonmoving party is "the touchstone for denial of an amendment").  In this case, the Court finds that Defendants would be substantially and unfairly prejudiced if Plaintiff were allowed to amend his complaint a third time, particularly given Plaintiff's inability to cure the myriad legal deficiencies that were evident in two prior amendments.  Even were the Court not persuaded that Defendants would be substantially prejudiced by being presented with a fourth complaint in this action, the Court would find it appropriate to deny leave to amend.  The Third Circuit has held that in the absence of substantial or undue prejudice, denial must instead be based on bad faith or dilatory motives, truly undue or unexplained delay, repeated failures to cure the deficiencies by amendments previously allowed, or futility of amendment.  Id.  Consideration of these factors would cause the Court to find that Plaintiff has exhibited dilatoriness in this action, most particularly by prolonging this litigation through the filing of two amended complaints that added no legal merit to Plaintiff's original claims and were substantially identical to the original complaint.  Additionally, as noted, Plaintiff has repeatedly failed to cure prior deficiencies in the

17

amendments previously allowed and, at least with respect to certain of the claims, it appears that further amendment would be futile. For all of these reasons, the Court finds that Plaintiff should not be granted leave to amend his complaint a third time.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **STEPHEN G. CONKLIN,** | : | |
| | : | **Civil Action No. 1:05-CV-1726** |
| **Plaintiff** | : | |
| | : | **(Chief Judge Kane)** |
| **v.** | : | |
| | : | |
| **PURCELL, KRUG & HALLER, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## <u>ORDER</u>

**AND NOW** this 31st day of January 2007, for the reasons set forth in the within

memorandum, **IT IS HEREBY ORDERED THAT:**

1.   The Motions to Dismiss filed by all Defendants (Doc. Nos. 28, 30, 32, 34, and 55)
are **GRANTED**.  Plaintiff's second amended complaint against all named
Defendants is hereby **DISMISSED**.

2.   The Clerk of Court is directed to enter judgment in favor of all Defendants in this
action and close the file.

<u>S/ Yvette Kane</u>
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania